IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT JOSEPH GRAY,<br><br>Defendant. | MEMORANDUM OPINION AND ORDER<br><br><br><br>Case No. 1:07 CR 00020 |

    Robert Joseph Gray has been indicted on charges of possession of a firearm by an unlawful user of controlled substances in violation of 18 U.S.C. § 922(g)(3) and possession of chemicals used to make methamphetamine in violation of 21 U.S.C. § 841(c).  Mr. Gray seeks to suppress evidence seized during a search of his residence and statements he made to law enforcement agents on January 11, 2005.  Mr. Gray advances several arguments in support of his motion.  But for the reasons described in detail in the body of this order, the court denies Mr. Gray's motion.  First, exigent circumstances justified the agents' initial warrantless entry into Mr. Gray's residence.  Second, the affidavit in support of the search warrant (which was in the process of being written during the initial warrantless entry) authorizing a search of Mr. Gray's residence established the reliability of the confidential informant's information.  Third, the description of the premises to be searched in the warrant included outbuildings and trailers

behind Mr. Gray's residence and permitted the seizure of the firearm. Finally, Mr. Gray's statements were voluntarily made.

## FINDINGS OF FACT[1]

**The Warrantless Entry**

At the evidentiary hearing, the United States' first witness was Deputy Steve Haney. Deputy Haney has been in law enforcement for eleven years and, in January 2005, Deputy Haney was working as an agent with the Weber-Morgan Narcotics Strike Force ("Strike Force"). That month Deputy Haney had received information from one of his confidential informants ("CI"), that a man named Clint Loftus had contacted the CI, telling him that he had the equipment to start a methamphetamine laboratory but he needed someone to actually make, or "cook," the methamphetamine. (The CI was a methamphetamine cook.)

Deputy Haney had the CI arrange a meeting with Mr. Loftus on January 11, 2005. Before the meeting, Deputy Haney gave the CI a transmitter to record conversation between Mr. Loftus and the CI. Deputy Haney watched Mr. Loftus (who was known to Deputy Haney) get into the CI's car. The Deputy saw that Mr. Loftus was carrying a black bag, about the size of an average backpack.

Although the transmitter apparently was working, Deputy Haney couldn't hear "exactly what was being said" because the car radio was too loud. (Transcript of Sept. 12, 2007 Evidentiary Hearing (hereinafter "Tr.") 21.) After the CI and Mr. Loftus drove around for a few minutes, the CI took Mr. Loftus back to the same area where they had met. Deputy Haney asked other Strike Force agents (approximately five to seven agents had joined Deputy Haney) to

---

[1] All Findings of Fact are based on evidence presented at the September 12, 2007 evidentiary hearing and the challenged warrant and affidavit.

continue watching Mr. Loftus while Deputy Haney left to meet with the CI. The agents watched Mr. Loftus get into a green Ford Explorer and travel to a home located at 1173 North 3000 West, Marriott-Slaterville, Utah ("the residence"). Mr. Loftus went behind the residence, still carrying the black bag.

The CI told Deputy Haney that in the bag he had seen ephedrine soaking, ephedrine liquid and other precursors used to make methamphetamine. The CI, himself a methamphetamine cook, told Deputy Haney, "I know for a hundred percent fact that the stuff in that backpack is used to make methamphetamine." (Id. at 10-11.) With that information, Deputy Haney returned to his office and began drafting a search warrant.

On his desk, Deputy Haney had a radio. As he worked on the affidavit and search warrant, he could hear and speak to the Strike Force agents who were watching the residence. They told him that Mr. Loftus had left the residence and gotten into a vehicle that was leaving the residence. At the direction of Deputy Haney, the agents stopped the vehicle. Mr. Loftus was in the vehicle but the black bag was not.

Almost immediately after the agents stopped the vehicle, other agents saw a Honda and a small silver truck park in front of the residence and several children get out and walk towards the residence. When Deputy Haney learned this, he instructed the agents to stop the children. Deputy Haney, based on his experience in law enforcement, was well aware of the dangers of methamphetamine labs. The agents told Deputy Haney that "the house is seized. It's secure." (Id. at 15.) Deputy Haney finished the affidavit and warrant and left his office to have a judge sign the documents.

Officer Ryan Reid testified at the hearing. Officer Reid, who has been in law enforcement for ten years, was on assignment to the Strike Force in January 2005. He was one

of the agents who was watching the residence on January 11.  Officer Reid described how he saw Mr. Loftus and Mr. Gray moving cars that were parked on the south side of the residence and go in and out of a trailer located at the southwest corner by the residence.  After about twenty minutes, Officer Reid saw the Honda and the small truck park in front of the residence and several people, including some children, get out and start into the residence.  Officer Reid was alarmed because he knew that Deputy Haney suspected that there was a methamphetamine lab in the residence.  So, he called Deputy Haney on his radio and Deputy Haney told him to stop anyone from going into the residence.

Officer Reid and several other agents ran to the residence where they stopped the people who hadn't yet entered the residence.  Then he and other agents went into the residence (the door was open) to find those who had already gone in (including several of the children).  Officer Reid and the other agents went into the living room where Officer Reid identified himself as a police officer.  Officer Reid explained: "I just got behind them and just said, 'we're going this direction right here.  Out of the house right now.'"  (Id. at 48.)  Officer Reid took the people who had been inside the residence out to the street.  The children were taken to one of the other agent's van.  Officer Reid testified that, upon entry into the residence, there was at least one child and one adult (whom he brought outside) and that at the same moment "some people had been going into the garage at the same moment."  (Id. at 49.)

**Mr. Gray's First Statement**

After Officer Reid shepherded people out of the residence, he spoke with Mr. Gray, who was inside a vehicle backing a trailer up to the garage, and took Mr. Gray to his vehicle.  In his

vehicle, Officer Reid interviewed Mr. Gray. Mr. Gray was not handcuffed[2], although he was, in Officer Reid's words "detained." (Id. at 52.) Officer Reid began the interview by answering Mr. Gray's questions, such as "who are you guys?" (Id.) Next, he advised Mr. Gray of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), reading the rights verbatim from a card that the Officer had with him. Once Officer Reid finished reading the rights, he asked Mr. Gray if Mr. Gray understood. Mr. Gray answered that he did and said, "I'm willing to answer any questions you guys have." (Id. at 55.)

The interview lasted approximately twenty minutes. Officer Reid testified that throughout the interview, the mood "was calm, collective. It was kind of an informal fashion, given we were sitting in a car." (Id. at 56.) Although Officer Reid was wearing a firearm, it was hidden from view. Officer Reid did not raise his voice or yell at Mr. Gray. He did not threaten Mr. Gray or make him promises.[3]

**The Search Pursuant to Warrant**

The language of the warrant and the affidavit that is relevant to this order is the warrant's description of the area to be searched and items to be seized, and Officer Reid's statement in the affidavit about the reliability of the CI. The area is described as:

> 3000 w, 1173 n, Marriott-Slaterville, Utah: is a residence with a garage attached. The house has white siding with red bricks that outline the bottom of the residence. The house is on the west side of the road and the front door faces east.

---

[2]Officer Reid unequivocally stated that Mr. Gray was not handcuffed during his initial interview. (Id. at 52.) During Mr. Gray's testimony, Mr. Gray responded to a general question (and not specifically referring to the interview) that he was handcuffed initially but later un-handcuffed. (Id. at 77.) The court finds given Officer Reid's unequivocal statement and the nebulous statement by Mr. Gray, that Officer Reid's testimony is more credible.

[3]The interview was recorded on a cassette but somehow, apparently unintentionally, the cassette was damaged.

> This includes all outbuildings, campers, trailers, vehicles, and any property contained within the property lines.

(Warrant, Pl.'s Ex. 1.)

The search warrant authorized the seizure of methamphetamine and its precursors as well as any makeshift laboratory or its components. (Id.)

Officer Haney had this to say about the reliability of the CI:

> CI #1 has provided information to the Strike Force on numerous cases that have been true and accurate through independent investigations. CI# 1 has provided his/her information. CI#1 has made numerous controlled purchases for the Weber Morgan Strike Force and on those occasions the CI followed instructions given and has been a very reliable source of information. Your Affiant [Officer Haney] believes CI#1 to be trustworthy and reliable.

(Aff., Pl.'s Ex. 1.)

After interviewing Mr. Gray, Officer Reid went to the area where Deputy Haney was waiting with the search warrant. (Deputy Haney, on his way to have a judge sign the warrant, was involved in a traffic accident and was delayed.) Officer Reid took the warrant back to the residence where he began to direct a search of the residence. In the residence, the agents found a firearm. In a trailer located to the southwest of the residence, the agents found a methamphetamine laboratory.[4]

**Mr. Gray's Second Statement**

Later that evening, perhaps around nine p.m., Deputy Haney interviewed Mr. Gray in Mr. Gray's garage. At the evidentiary hearing, Deputy Haney could not state with certainty whether Mr. Gray was in handcuffs. Deputy Haney did not repeat the Miranda advice of rights to Mr.

---

[4] In a garage adjoined to the residence, the agents found methamphetamine before the search warrant issued. The methamphetamine was in a bag in the middle of the floor of the garage. But the Government is not offering this against Mr. Gray and, therefore, it is not at issue.

Gray because Officer Reid had told Deputy Haney that he had already read the rights to Mr. Gray.  Deputy Haney did ask Mr. Gray whether he had been advised of his rights and Mr. Gray answered yes.

The interview lasted about ten minutes.  Deputy Haney did not raise his voice, threaten Mr. Gray or make him promises.  As Deputy Haney testified, "It was just a conversation.  It was just me asking him certain questions about what he knew and what his involvement would be in the case."  (Tr. at 20.)

**The Grays' Testimony**

Both Mr. Gray and his wife, Teresa Gray, testified.  For the most part, the testimony they gave was not relevant to any of the issues raised in the motion to suppress.  Mr. Gray testified that he was not in the residence when the agents entered.  He admitted that the interviews with Officer Reid and Deputy Haney were brief.  He agreed that neither men had threatened him or made him any promises during the interviews.

**CONCLUSIONS OF LAW**

Mr. Gray raises the following arguments in support of his motion: (1) the warrantless search of the residence violated the Fourth Amendment; (2) the warrant did not describe the area to be searched with sufficient particularity; (3) the seizure of the firearm was not authorized by the warrant; (4) the affidavit did not establish probable cause; and (5) Mr. Gray's statements were not made voluntarily.

**1.      Exigent Circumstances Justified the Officers' Entry Into the Residence**.

Mr. Gray argues that his constitutional rights were violated when officers entered into and searched his home, garage and yard, without a warrant.  But the Government contends that the

presence of people, particularly children, justified a warrantless search because of the dangers of methamphetamine lab components and precursors.

Under the Fourth Amendment, every search or seizure by the government must be reasonable. See Illinois v. McArthur, 531 U.S. 326, 330 (2001). Generally, searches and seizures are unreasonable and invalid unless based on probable cause and executed under a warrant. See Katz v. U.S., 389 U.S. 347, 357 (1967). Officers may conduct a warrantless search or seizure if exigent circumstances justify the intrusion. See United States v. Thomas, 372 F.3d 1173, 1177 (10th Cir. 2004). The exigent circumstances exception applies to a warrantless entry when the circumstances pose a significant risk to the safety of a police officer or a third party. Id. The Tenth Circuit's test for exigent circumstances is two-fold: (1) whether the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) whether the manner and scope of the search is reasonable. United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006). The government bears the burden of establishing exigency. United States v. Rhiger, 315 F.3d 1283, 1288 (10th Cir. 2003) (the court found reasonable belief that officer and public safety were threatened by methamphetamine lab).

The court evaluates whether the officers were confronted with reasonable grounds to believe that there was an immediate need guided by the realities of the situation presented in the record from the viewpoint of "prudent, cautious, and trained officers." See Najar, 451 F.3d at 718-19. In this case, the officers reasonably believed that they had an immediate need to protect the safety of the people, especially children, entering the residence. Threats to public safety are widely accepted as one of the exigent circumstances exceptions to the Fourth Amendment's warrant requirement. See Warden v. Hayden, 387 U.S. 294, 298-99 (1967). Deputy Haney knew from the CI that Mr. Loftus was carrying a black bag containing the components of a

methamphetamine lab, including an ephedrine soak. The agents watched Mr. Loftus go to Mr. Gray's residence with the black bag and knew from the subsequent traffic stop of Mr. Loftus that the black bag was no longer with him. Accordingly, the officers reasonably believed that Mr. Loftus had left the black bag at Mr. Gray's residence.

Deputy Haney testified that "meth labs are inherently dangerous . . . they can create very toxic gas, very lethal gas. Phosphate gas can kill you with just one sniff." (Tr. at 11.) When agents told Deputy Haney that several children were entering Mr. Gray's residence, Deputy Haney "made the decision that we needed to stop these children from going in the residence" and to seize the house. (Id. at 13.) Thereafter, the officers briefly entered the residence and cleared it of children and adults so that they would not be exposed to the dangers of a methamphetamine lab or its components.

Accordingly, the officers' entry into the residence without a warrant was justified.

**2.    The Search Warrant Describes the Area to be Searched and Items to be Seized With Sufficient Particularity.**

Mr. Gray argues that the search warrant fails to describe with particularity the property that was searched. Primarily, Mr. Gray argues that the search warrant was overly broad and that it did not specify the property lines or include the area behind Mr. Gray's residence and garage, which had a parked trailer behind it.

The Fourth Amendment requires that a warrant describe with "particular[ity] . . . the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. "The test for determining the adequacy of the description of the location to be searched is whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be

mistakenly searched." United States v. Lora-Solano, 330 F.3d 1288, 1293 (10th Cir. 2003) (internal quotations omitted).

The search warrant describes the premises as "3000 w, 1173 n, Marriott-Slaterville, Utah: is a residence with a garage attached. The house has white siding with red bricks that outline the bottom of the residence. The house is on the west side of the road and the front door faces east. This <u>includes all outbuildings, campers, trailers</u>, vehicles, and any property contained within the property lines." (Warrant, Pl.'s Ex. 1 (emphasis added).)

In this case, there is no probability that officers might mistakenly search the wrong premises because the address and description of the premises was clearly stated in the warrant. Moreover, common sense indicates that Deputy Haney specifically intended to include the trailer behind Mr. Gray's residence by using the language "trailer" in the search warrant.

Accordingly, the warrant's description was sufficient to enable the officers to locate and identify the premises to be searched and there was no probability that the officers might mistakenly search the wrong premises.

**3.      The Seizure of the Firearm Was Proper**.

Mr. Gray also argues that the executing officers exceeded the scope of the warrant because the warrant did not provide for the seizure of the firearm.[5] In support, Mr. Gray argues that the only things described in the search warrant and authorized to be seized by the issuing judge were methamphetamine and a clandestine lab.

Generally, the defendant has the burden of showing a constitutional infirmity if a search or seizure was carried out pursuant to a warrant. See United States v. Esser, 451 F.3d 1109, 1112

---

[5] Nothing in the record specifically states where the firearm was found.


(10th Cir. 2006). Mr. Gray argues that the execution of the warrant was expanded into an impermissible general search thereby requiring the suppression of the firearm. The "general rule," where officers exceed the scope of the warrant "is that 'only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant.'" See United States v. Le, 173 F.3d 1258, 1269 (10th Cir. 1999) (quoting United States v. $149,442.43 in U.S. Currency, 965 F.2d 868, 875 (10th Cir. 1992).) Therefore, the relevant inquiry involves a determination of the "effect on the search as a whole of the seizure by the local police of items not named in the warrant." See $149,442.43 in U.S. Currency, 965 F.2d at 875.

     The officers executing the legitimate search warrant acted reasonably and in good faith in executing the warrant and in the seizure of the firearm. Moreover, Mr. Gray has presented no evidence to the contrary. Although the firearm was not specifically covered in the warrant and was seized during the execution of the warrant, there is nothing in the record that reflects disregard of the search warrant's terms. The firearm was discovered pursuant to a valid warrant-based search for methamphetamine. The Tenth Circuit has stated that firearms are "considered to be tools of the trade." Id. at 876. Clearly, drugs and drug-related materials could be seized because probable cause existed to support the conclusion that firearms were either proceeds of, or could be used to facilitate, illegal drug transactions. Id. at 875. Also, the officers likely knew that it was a federal offense for a user of drugs to possess a firearm. Accordingly, the officers did not flagrantly disregard the scope of the warrant thereby expanding it into an impermissible general search.

     For the foregoing reasons, Mr. Gray has not met his burden of showing a constitutional infirmity of the search of his residence because the firearm was found during the execution of a

legitimate search warrant.  See Esser, 451 F.3d at 1112.  Accordingly, the seizure of the firearm was proper.

**4.     The Search Warrant was Based on Probable Cause.**

Mr. Gray argues that the search warrant did not contain probable cause to support the search of his residence.  Specifically, he argues that Deputy Haney's affidavit was based upon unreliable information from the CI.

In assessing probable cause, an affidavit must be viewed under the flexible "totality of circumstances" test adopted by the United States Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983).  Specifically, a court must determine whether the issuing court made "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Id. at 238; accord United States v. Mesa-Rincon, 911 F.2d 1433, 1439 (10th Cir. 1990).  The court must determine whether, under the totality of the circumstances presented in the affidavit, the magistrate judge had a "substantial basis for concluding that probable cause existed."  Gates, 462 U.S. at 214; see also  United States v. Cantu, 405 F.3d 1173, 1176 (10th Cir. 2005).  The magistrate judge's decision to issue a warrant is entitled to great deference.  Gates, 462 U.S. at 236; United States v. Glover, 104 F.3d 1570, 1577 (10th Cir. 1997).  Specifically, a reviewing court "should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."  Ornelas v. United States, 517 U.S. 690, 699 (1996).

Probable cause "requires a nexus between suspected criminal activity and the place to be searched."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000) (internal quotation marks and citation omitted).  And "[a]n affidavit in support of a search warrant must contain

facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." Id.

The affidavit in this case meets the probable cause standard. Officer Haney received information from a CI that Mr. Loftus had contacted the CI, telling the CI that he had the equipment to make a methamphetamine laboratory but needed someone to make or "cook" it. So, Deputy Haney had the CI arrange a meeting with Mr. Loftus. Deputy Haney watched the meeting occur and saw Mr. Loftus, who was carrying a black bag, get into the CI's car. The CI and Mr. Loftus drove around for a few minutes and then Mr. Loftus told the CI that he would walk back to a location where the methamphetamine-making items were being kept.

Deputy Haney met with the CI while other officers watched Mr. Loftus. The CI, a methamphetamine cook, told Deputy Haney that he was "a hundred percent" certain that "the stuff in the backpack is used to make methamphetamine." (Tr. at 10-11.) Accordingly, Deputy Haney returned to his office to draft a search warrant. Meanwhile, agents saw that Mr. Loftus was picked up by another vehicle and taken to Mr. Gray's residence. Mr. Loftus went behind the residence carrying the bag. While drafting the affidavit and search warrant, Deputy Haney learned that Mr. Loftus had left the residence and gotten into a vehicle. Deputy Haney asked the agents to stop the vehicle. Mr. Loftus was in the vehicle but the black bag was not.

Deputy Haney stated in his affidavit that the CI was reliable and trustworthy. Moreover, he stated that the CI had provided information "on numerous cases that [has] been true and accurate through independent investigations." (Aff., Pl.'s Ex.1.)

For the foregoing reasons, the totality of the circumstances and the information contained in the search warrant affidavit would warrant a man of reasonable caution to believe that

methamphetamine precursors and lab equipment were on the premises of Mr. Gray's residence. Accordingly, the search warrant was based on probable cause.

**5.     Mr. Gray's <u>Miranda</u> Rights Were not Violated.**

Mr. Gray argues that his incriminating statements to officers were not voluntary and that when he was questioned a second time, after initially being read his <u>Miranda</u> rights by Officer Reid, that Deputy Haney was required to read him his <u>Miranda</u> rights again.

The test to determine the voluntariness of a confession is "whether, considering the totality of the circumstances, the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." <u>United States v. Erving L.</u>, 147 F.3d 1240, 1248-49 (10th Cir. 1998). Courts must consider both the defendant's characteristics and the details of the interview. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).

In considering whether a particular confession is coerced, a court considers the following factors: "(1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment." <u>Erving L.</u>, 147 F.3d at 1249 (internal quotation marks and citation omitted).

After Officer Reid cleared the residence of adults and children, he informed Mr. Gray of his <u>Miranda</u> rights and then interviewed him. Officer Reid asked Mr. Gray if he understood and Mr. Gray answered that he did and said, "I'm willing to answer any questions you guys have." (Tr. at 55.) About two or three hours later, Deputy Haney interviewed Mr. Gray a second time.

Officer Reid had told him that he had already read the rights to Mr. Gray but Deputy Haney asked Mr. Gray whether he had been advised of his rights anyway, and Mr. Gray answered yes.

Mr. Gray is an adult with no evidence of any mental disability. The length of both interviews was relatively short (twenty and ten minutes respectively) and the nature of the interviews was to ask Mr. Gray about his methamphetamine use and the possible location of any methamphetamine lab components. Mr. Gray was not subjected to any physical punishment. Moreover, the officers did not psychologically coerce Mr. Gray with any threats or promises. Mr. Gray did not present evidence that during the interviews he was coerced, threatened or made any promises. Rather, Mr. Gray testified "I don't think they had threatened me, any, no." (Tr. at 83.) And when asked whether the officers made Mr. Gray any promises or leniency for his cooperation, he replied "I don't believe so. I don't think so." (Id. at 84.)

Next, Mr. Gray argues that because Deputy Haney did not interview Mr. Gray until two to three hours after Officer Reid read him his Miranda rights, Deputy Haney should have warned him of his rights again. There is no specific amount of time that must pass before officers must repeat Miranda rights to a detained person. Rather, the Tenth Circuit adopts a "totality of the circumstances" test that asks whether the circumstances changed so significantly that the defendant's answers were no longer voluntary or the defendant was no longer knowingly and intelligently relinquishing his rights. See Mitchell v. Gibson, 262 F.3d 1036, 1057-58 (10th Cir. 2001).

Mr. Gray's confirmation to Deputy Haney that he had already been given his Miranda warnings was sufficient. Deputy Haney testified that Mr. Gray was not handcuffed and the conversation lasted for ten minutes. Deputy Haney did not threaten or make Mr. Gray any

promises.  The second interview happened only two to three hours after Officer Reid initially read Mr. Gray his rights.

For the foregoing reasons, Mr. Gray's statements to Deputy Haney and Officer Reid were voluntary.

## ORDER

The court DENIES Defendant Robert Joseph Gray's Motion to Suppress (Dkt # 21).

DATED this 13th day of November, 2007.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge